## <u>Index of Exhibits to Fried Complaint</u>

Employment Agreement ....................................................................................................A

Severance Agreement ......................................................................................................B

130739010.1

# Exhibit A

# EMPLOYMENT AGREEMENT

This **EMPLOYMENT AGREEMENT**, dated December 30, 2021 (the "Agreement"), is entered into by and between AdaptHealth LLC (the "Company"), and Michael Fried (the "Employee").

**WHEREAS**, the Company desires to employ the Employee and the Employee desires to accept such employment, in each case upon the terms and conditions contained herein;

**NOW THEREFORE**, in consideration of the promises and the mutual agreements made herein, the Company and the Employee, intending to be legally bound hereby, agree as follows:

1.      Employment; Duties. The Company shall engage the Employee to serve as President of Community Surgical Supply of Toms River, LLC ("CSS"), reporting to the President of AdaptHealth Corp, or his designee. Employee hereby agrees to serve in such capacity, during the "Employment Period" as defined in Section 2. The Employee agrees that during the Employment Period, he shall give his best effort, skill and abilities to promote the business and interests of the Company as reasonably directed by the Company (acting for all purposes of this Agreement through its specifically identified designee). The Employee agrees to faithfully and diligently perform such reasonable duties, commensurate with the Employee's position and work time commitment, as may from time to time be assigned to the Employee by the Company.

Employee represents to the Company that he is not subject or a party to any employment agreement, non-competition covenant, non-disclosure agreement or other agreement, covenant, understanding or restriction of any nature whatsoever which would be breached by Employee's execution of this Agreement and/or his performance of his duties and responsibilities hereunder, or which would in any manner, directly or indirectly, limit or affect the duties and responsibilities which may now or in the future be assigned to Employee by the Company.

2.      Employment Period. This Agreement shall have an initial term of two (2) years to be effective commencing on the date first written above (the "Effective Date") and ending on the second anniversary of the Effective Date (the "Initial Employment Period"), unless sooner terminated in accordance with the provisions of Section 7 or Section 8. This Agreement shall automatically renew and continue to remain in effect after the Initial Employment Period on a month-to-month basis (each month, a "Renewal Employment Period"), until terminated as provided herein, unless either party provides the other party with written notice of non-renewal not later than thirty (30) days prior to the expiration of the Initial Period or any Renewal Employment Period. The Initial Employment Period and each Renewal Employment Period of this Agreement shall be collectively referred to herein as the "Employment Period."

3.      Compensation.

        (a)      Base Compensation. The Employee shall be paid a base salary of Three Hundred Fifty Thousand Dollars ($350,000.00) per year, less any applicable required and voluntary deductions (the "Base Salary"). The Base Salary shall be paid to Employee consistent with the Company's regular payroll practices and shall be less (i) such amounts as required by law and (ii) any voluntary deductions elected by Employee.

(a)  <u>Benefits</u>. The Employee shall, during the term hereof, be entitled to participate in such employee benefit plans of the Company as are generally made available to the executive level employees of the Company from time to time, to the extent the Employee is eligible under the terms of such plans. Nothing contained herein shall be construed to limit the Company's ability to amend, suspend, or terminate any employee benefit plan or policy at any time without providing the Employee notice, and the right to do so is expressly reserved.

(b)  <u>Expense Reimbursement</u>. The Employee shall be entitled to reimbursement of reasonable out-of-pocket expenses incurred in connection with travel and matters related to the Company's business and affairs if made in accordance with written Company policy as in effect from time to time as determined by the Company. Such written Company policy and any updates shall be provided to Employee. This amount is not to exceed Five Thousand Dollars ($5,000.00) for any single thirty (30) day period without prior written Company approval.

(c)  <u>Place of Employment</u>. The parties agree that the principal place of services to be rendered to the Company by Employee shall be in Toms River, New Jersey.

(d)  <u>Annual Bonus</u>. The Employee shall be eligible to receive bonus compensation (the "<u>Bonus</u>") in accordance with performance criteria and other terms and conditions as set forth by the Company at such time. Employee's bonus target shall be 50% of the Base Salary. Employee is not, however, guaranteed to receive that or any other amount; Employee's receipt of the Bonus is dependent on Employee and the Company meeting certain enumerated targets. All Bonus compensation payable to Employee shall be less such amounts as are required to be withheld by law and shall be paid when such bonus compensation is paid to other similarly situated Company executives and in any case no later than two and half months after the end of the calendar year to which the Bonus relates.

(e)  <u>Incentive Compensation</u>. The Employee shall receive "<u>Incentive Compensation</u>" based on CSS exceeding certain annual net revenue thresholds in calendar year 2022. Specifically, the Employee shall be eligible to receive

(i)  10% of net revenue from operations in New York and New Jersey that results in infusion pharmacy gross margin in excess of $6,500,000 for CSS in calendar year 2022, and

(ii)  10% of net revenue in excess of $7,800,000 from the Ohio Veteran's Administration contract number 36C25021D0015 for CSS in calendar year 2022.

For purposes herein, gross margin means net revenue less cost of goods sold.

For the avoidance of doubt, the Employee shall not be eligible to receive any Incentive Compensation for calendar years other than 2022.

All Incentive Compensation earned and to be paid out pursuant to this subpart shall be as determined by AdaptHealth Corp.'s Compensation Committee based upon audited financials in its sole discretion. Incentive Compensation shall be less such amounts as are required to be withheld by law and shall be paid no later than two and half months after the end of the calendar year to which the Incentive Compensation relates. The Employee must remain employed for the entire

2

applicable calendar year to be eligible to receive Incentive Compensation unless the Employee terminates for good reason.

(f)      Severance Pay. If Employee's employment is terminated without "cause," pursuant to Section 7(c), or if Employee resigns for "Good Reason," pursuant to Section 7(d), then Employee shall be entitled to payment in an amount equal to the greater of (i) the number of months then remaining in the Initial Employment Period of Employee's Base Salary as of the date of termination or (ii) twelve (12) months of Employee's Base Salary in effect as of the date of termination ("Severance Pay"). Notwithstanding anything else herein, Employee's receipt of the Severance Pay is specifically predicated upon Employee's execution, delivery and non-revocation of a severance and general release agreement in a form agreeable to the Company (and the expiration of any revocation period contained in such general release) within sixty (60) days following the date of the Employee's termination of employment hereunder. The Severance Pay shall be paid on a bi-weekly basis, consistent with the Company's then-effective payroll practices and commence on the first regular payroll date after the effective date of such agreement. The payments making up the Severance Pay shall be less such amounts as are required to be withheld or deducted by law.

4.      Trade Secrets. The Employee agrees that it is in the Company's legitimate business interest to restrict his disclosure or use of Trade Secrets and Confidential Information relating to the Company or its affiliates as provided herein, and agrees not to disclose or use the Trade Secrets and/or Confidential Information relating to the Company or its affiliates for any purpose other than in connection with his performance of his duties to the Company. For purposes of this Agreement, "Trade Secrets" shall mean all confidential and proprietary information belonging to the Company (including all trade secrets as defined by 18 USC § 1839(3), recorded prospective client lists, ideas, formulas, compositions, inventions (whether patentable or unpatentable and whether or not reduced to practice), know-how, manufacturing and production processes and techniques, research and development information, drawings, specifications, designs, plans, proposals, technical data, copyrightable works, financial and marketing plans and customer and supplier lists and information). For purposes of this Agreement, "Confidential Information" shall mean all information other than Trade Secrets belonging to, used by, or which is in the possession of the Company and relating to the Company's business or assets specifically including, but not limited to, information relating to the Company's products, services, strategies, pricing, customers, representatives, suppliers, distributors, technology, finances, employee compensation, computer software and hardware, inventions, developments, in each case to the extent that such information is not required to be disclosed by applicable law or compelled to be disclosed by any governmental authority. Notwithstanding the foregoing, the terms "Trade Secrets" and "Confidential Information" do not include information that is or becomes generally available to or known by the public (other than as a result of a disclosure by the Employee), provided, that the source of such information is not known by the Employee to be bound by a confidentiality agreement with the Company; or is independently developed by the Employee without violating this Agreement.

Employee shall not be held criminally or civilly liable under any U.S. Federal or State trade secret law for the disclosure of a trade secret that is made (a)(i) in confidence to a U.S. Federal, State or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. If Employee

files a lawsuit against the Company for retaliation by the Company for reporting by Employee of a suspected violation of law, Employee may disclose the trade secret to Employee's attorney and use the trade secret information in the court proceeding, if Employee (a) files any document containing the trade secret under seal; and (b) does not disclose the trade secret, except pursuant to court order. Nothing in this Agreement is intended to conflict with 18 U.S.C. §1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. §1833(b).

     5.    <u>Return of Documents and Property</u>. Upon the expiration or termination of the Employee's employment with the Company, or at any time upon the reasonable request of the Company, the Employee (or his heirs or personal representatives) shall deliver to the Company (a) all documents and materials (including, without limitation, computer files) containing Trade Secrets and Confidential Information relating to the business and affairs of the Company or its affiliates, and (b) all documents, materials, equipment and other property (including, without limitation, computer files, computer programs, computer operating systems, computers, printers, scanners, pagers, telephones, credit cards and ID cards) belonging to the Company or its affiliates, which in either case are in the possession or under the control of the Employee (or his heirs or personal representatives).

     6.    <u>Discoveries and Works</u>. All Discoveries and Works made or conceived by the Employee during his employment by the Company, solely, jointly or with others, that relate to the Company's present or anticipated activities, or are used or useable by the Company shall be owned by the Company. For the purposes of this <u>Section 6</u>, (including the definition of "<u>Discoveries and Works</u>") the term "<u>Company</u>" shall include the Company and its affiliates. The term "<u>Discoveries and Works</u>" includes, by way of example but without limitation, Trade Secrets and other Confidential Information, patents and patent applications, service marks, and service mark registrations and applications, trade names, copyrights and copyright registrations and applications. The Employee shall (a) promptly notify, make full disclosure to, and execute and deliver any documents requested by the Company, as the case may be, to evidence or better assure title to Discoveries and Works in the Company, as so requested, (b) renounce any and all claims, including but not limited to claims of ownership and royalty, with respect to all Discoveries and Works and all other property owned or licensed by the Company, (c) assist the Company in obtaining or maintaining for itself at its own expense United States and foreign patents, copyrights, trade secret protection or other protection of any and all Discoveries and Works, and (d) promptly execute, whether during his employment with the Company or thereafter, all applications or other endorsements necessary or appropriate to maintain patents and other rights for the Company and to protect the title of the Company thereto, including but not limited to assignments of such patents and other rights. Any Discoveries and Works which, within one (1) year after the expiration or termination of the Employee's employment with the Company, are made, disclosed, reduced to tangible or written form or description, or are reduced to practice by the Employee and which pertain to the business carried on or products or services being sold or delivered by the Company at the time of such termination shall, as between the Employee and, the Company, be presumed to have been made during the Employee's employment by the Company. The Employee acknowledges that all Discoveries and Works shall be deemed "<u>works made for hire</u>" under the U.S. Copyright Act of 1976, as amended 17 U.S.C. Sect. 101.

     7.    <u>Termination</u>.

(a)    Termination by the Company. The Company may terminate this Agreement with cause at any time during the Employment Period effective immediately upon giving written notice of termination to the Employee. For purposes of this Agreement, "cause" shall mean, with respect to the Employee, (i) an act of dishonesty by Employee in connection with Employee's responsibilities as an employee; (ii) Employee's conviction of, or plea of nolo contendere to, a felony or any crime involving fraud, embezzlement, or any other act of moral turpitude; (iii) Employee's gross misconduct; (iv) Employee's unauthorized use or disclosure of any proprietary information or trade secrets of the Company or any other party to whom Employee owes an obligation of nondisclosure as a result of Employee's relationship with the Company; (v) Employee's willful breach of any obligations under any written agreement or covenant with the Company; (vi) Employee's violation of the Company's material policies (such as, but not limited to, policies regarding harassment, workplace violence, confidential information, or use drugs and alcohol); or (vii) Employee's continued failure to perform Employee's employment duties or violation of Company policies after Employee has received a written demand of performance from the Company which specifically sets forth the factual basis for the Company's belief that Employee has not substantially performed Employee's duties and the Company recommended cure for such failure.  Further provided that the Employee has failed to cure such non-performance to the Company's satisfaction within twenty (20) business days after receiving such notice.

(b)    Effect of Termination by Company for Cause or Termination by Employee without Good Reason. Except as otherwise provided herein, in the event this Agreement is terminated for "cause" by the Company pursuant to this Section 7(b), or in the event that this Agreement is terminated by the Employee without Good Reason pursuant to Section 7(f), the Employee's rights and the Company's obligations hereunder shall cease as of the effective date of the termination including, without limitation, with respect to the right to receive Base Salary not yet accrued and all other compensation or benefits provided for in this Agreement, and the Employee shall not be entitled to any further compensation or severance compensation of any kind, other than the payment of Base Salary accrued through the termination date. The Employee shall have no further right or claim to any compensation (including any Bonus), benefits or severance compensation under this Agreement or otherwise against the Company or its affiliates, from and after the date of such termination by the Company for "cause," or by the Employee without Good Reason, except as required by applicable law. Any termination under this Section 7 is subject to the provisions of Section 17 hereof.

(c)    Effect of Termination by Company without Cause. Except as otherwise provided herein, in the event this Agreement is terminated without "cause" by the Company pursuant to this Section 7(c), the Employee shall be entitled to receive (i) the payment of any Base Salary earned and accrued through the termination date, and (ii) the Severance Pay described in Section 3(f). The Company will provide written notice of termination without "cause" to the Employee. Employee should be aware that a non-renewal of the Initial Term or any Renewal Employment Period as described in Section 2 is not a termination without "cause," and, thus, does not entitle the Employee to the Severance Pay. The Employee will nonetheless receive payment of any Base Salary earned and accrued through the termination date in the event of a nonrenewal.

(d)    Termination by Employee for Good Reason. The Employee may terminate this Agreement at any time during the Employment Period for Good Reason effective immediately upon delivery or written notice of termination to the Company. As used herein, "Good Reason"

5

means (i) a breach by the Company of any material provision hereof, which breach is not cured within thirty (30) days after delivery of written notice thereof by the Employee; (ii) a material reduction in the Base Salary not accompanied by a commensurate reduction for other similarly-situated employees of the Company; or (iii) a relocation of the Employee's principal work location to more than fifty (50) miles from his current principal work location.

(e)     Effect of Termination by Employee for Good Reason. In the event the Employee terminates this Agreement for Good Reason, the Employee shall be entitled to receive (i) the payment of any Base Salary earned and accrued through the termination date, and (ii) the Severance Pay described in Section 3(f).

(f)     Termination by Employee Without Good Reason. The Employee may terminate this Agreement without Good Reason at any time upon thirty (30) days' prior written notice setting forth in reasonable specificity the event that constitutes Good Reason, which written notice, to be effective, must be provided to the Company within sixty (60) days of the occurrence of such event. Upon termination under this Section 7(f), the Employee's rights and the Company's obligations hereunder shall cease as of the effective date of the termination, including, without limitation, with respect to the right to receive Base Salary not yet accrued and all other compensation or benefits provided for in this Agreement, and the Employee shall not be entitled to any further compensation or severance compensation of any kind, other than the payment of Base Salary accrued through the termination date.

8.     Disability: Death.

(a)     If, prior to the expiration of any applicable Employment Period, the Employee shall be unable to perform his duties hereunder by reason of physical or mental disability, even with a reasonable accommodation if necessary, for at least sixty (60) consecutive calendar days, the Company shall have the right to terminate this Agreement and the remainder of the Employment Period by giving written notice to the Employee to that effect. Immediately upon the giving of such notice, the Employment Period shall terminate.

(b)     Upon termination of this Agreement pursuant to Section 8(a), the Employee shall be paid his Base Salary through the effective date of such termination, in accordance with the terms of Section 3. All other compensation and benefits provided under this Agreement shall cease upon termination pursuant to Section 8(a), except as otherwise required by applicable law.

(c)     In the event of a dispute as to whether the Employee is disabled within the meaning of Section 8(a), either party may from time to time request a medical examination of the Employee by a doctor appointed by the chief of staff of a hospital selected by mutual agreement of the parties, or as the parties may otherwise agree, and the written medical opinion of such doctor shall be conclusive and binding upon the parties as to whether the Employee has become disabled and the date when such disability arose. The cost of any such medical examination shall be borne by the requesting party.

(d)     If, prior to the expiration of the Employment Period or the termination of this Agreement, the Employee shall die, the Employee's estate shall be paid any compensation due through such date of death. Except as otherwise provided in this Section 8(d), upon the death of

6

the Employee, the Employment Period shall terminate without further notice and the Company shall have no further obligations hereunder, including, without limitation, obligations with respect to compensation and benefits provided for in Section 3 of this Agreement, other than as required by law. Any termination under this Section 8 is subject to the provisions of Section 17 hereof

9.    No Conflicts. The Employee has represented and hereby represents to the Company and its affiliates that the execution, delivery and performance by the Employee of this Agreement do not conflict with or result in a violation or breach of, or constitute (with or without notice or lapse of time or both) a default under any contract, agreement or understanding, whether oral or written, to which the Employee is a party or of which the Employee is or should be aware and that there are no restrictions, covenants, agreements or limitations on his right or ability to enter into and perform the terms of this Agreement, and agrees to indemnify and hold harmless the Company and its affiliates from any liability, cost or expense, including attorney's fees, based upon or arising out of any such restrictions, covenants, agreements, or limitations that may be found to exist. For purposes of this Agreement, "Affiliate" shall include any subsidiary in the case of the Company, and any person or entity directly or indirectly controlled by or controlling the Company.

10.    Non-Competition. The Employee hereby agrees that, during the Employment Period and for a period of one (1) year thereafter or one (1) year after termination of this Agreement for any reason, whichever is earlier (the "Restricted Period"), the Employee will not, directly or by assisting others, within fifty (50) miles of any location where the Company conducts business (a) contact, solicit or attempt to solicit any person or entity who is a customer or supplier of the Company as of Employee's termination date, for purposes of providing products or services that are competitive with the products or services offered by the Company on the Employee's termination date, (b) provide to any such customer any products or services that are competitive with the products or services offered by the Company on the Employee's termination date, or (c) otherwise interfere with the relationship between any such customer or supplier and the Company or its Affiliates.

11.    Non-Solicitation. The Employee hereby agrees that, during the Restricted Period and except as agreed to in writing by the Company, the Employee will not (on behalf of the Employee or any other person or entity), directly or by assisting others, hire or solicit or attempt to hire or solicit, any person who was an employee of the Company on the Employee's termination date (a "Restricted Employee"), it being understood that this Section 11 shall not restrict the Employee or the Employee's affiliates from placing notices of general solicitation of employment; and provided further, that nothing in this Section 11 shall prevent the Employee or any of the Employee's affiliates from soliciting any Restricted Employee after the longer of (i) one year from the date of termination of such employee's employment by the Company or its Affiliates and (ii) one year from the date on which the Employee ceases to provide any paid work or services to the Company or its Affiliates.

12.    Enforcement. The Employee agrees that any breach of the provisions of this Agreement would cause substantial and irreparable harm, not readily ascertainable or compensable in terms of money, to the Company for which remedies at law would be inadequate and that, in addition to any other remedy to which the Company may be entitled hereunder, and notwithstanding the terms of Section 18 hereof, the Company shall be entitled to temporary, preliminary and other injunctive relief in the event the Employee violates the provisions of this

7

Agreement, as well as damages, including, without limitation consequential damages, and an equitable accounting of all earnings, profits and benefits arising from such violation, in each case without the need to post any security or bond. Nothing herein contained shall be construed as prohibiting the Company from pursuing, in addition, any other remedies available to the Company for such breach. A waiver by the Company of any breach of any provision hereof shall not operate or be construed as a waiver of a breach of any other provision of this Agreement or of any subsequent breach by the Employee.

Employee acknowledges that the restrictions contained in Sections 4, 5, 6, 10 and 11 hereof are reasonable, and that the Company would not have entered into this Agreement, in the absence of such restrictions, and that any violation of any provision of those Sections will result in irreparable injury to the Company.

EMPLOYEE FURTHER REPRESENTS AND ACKNOWLEDGES THAT (i) HE HAS BEEN ADVISED BY THE COMPANY TO CONSULT HIS OWN LEGAL COUNSEL IN RESPECT OF THIS AGREEMENT, (ii) HE HAS HAD FULL OPPORTUNITY, PRIOR TO EXECUTION OF THIS AGREEMENT, TO REVIEW THOROUGHLY THIS AGREEMENT WITH HIS COUNSEL, AND (iii) HE HAS READ AND FULLY UNDERSTANDS THE TERMS AND PROVISIONS OF THIS AGREEMENT.

Employee agrees that the Company shall be entitled to preliminary and permanent injunctive relief, without the necessity of providing actual damages, as well as an equitable accounting of all earnings, profits and other benefits arising from any violation of Sections 4, 5, 6, 10, or 11 hereof, which rights shall be cumulative and in addition to any other rights or remedies to which the Company may be entitled. In the event that any of the provisions of Sections 10 or 11 hereof should ever be adjudicated to exceed the time, geographic, product or service, or other limitations permitted by applicable law in any jurisdiction, then such provisions shall be deemed reformed in such jurisdiction to the maximum time, geographic, product or service, or other limitations permitted by applicable law.

13.   Successors and Assigns. This Agreement shall inure to the benefit of and shall be binding upon (a) the Company, its successors and assigns, and any company with which the Company may merge or consolidate or to which the Company may sell substantially all of its assets, and (b) Employee and his executors, administrators, heirs and legal representatives. Since the Employee's services are personal and unique in nature, the Employee may not transfer, sell or otherwise assign his rights, obligations or benefits under this Agreement.

14.   Notices. Any notice required or permitted under this Agreement shall be deemed to have been effectively made or given if in writing and personally delivered, or sent properly addressed in a sealed envelope postage prepaid by certified or registered mail, or delivered by a reputable overnight delivery service. Unless otherwise changed by notice, notice shall be properly addressed to the Employee if addressed to the address of record on file with the Company; and properly addressed to the Company if addressed to:

> c/o AdaptHealth LLC
> 220 West Germantown Pike, Suite 250
> Plymouth Meeting, PA 19462

8

Attention: Chief Executive Officer
Telephone: (484) 567-2442
Email: sgriggs@adapthealth.com

15.    Severability. It is expressly understood and agreed that although the Company and the Employee consider the restrictions contained in this Agreement to be reasonable and necessary for the purpose of preserving the goodwill, proprietary rights and going concern value of the Company, if a final determination is made by arbitration or any court having jurisdiction that any provision contained in this Agreement is invalid, the provisions of this Agreement shall not be rendered void but shall be deemed amended to apply as to such maximum time and territory and to such other extent as such arbitral body or court may determine or indicate to be reasonable. Alternatively, if the arbitral body or court finds that any provision or restriction contained in this Agreement or any remedy provided herein is unenforceable, and such restriction or remedy cannot be amended so as to make it enforceable, such finding shall not affect the enforceability of any of the other restrictions contained therein or the availability of any other remedy. The provisions of this Agreement shall in no respect limit or otherwise affect the Employee's obligations under any other agreements with the Company.

16.    Counterparts. This Agreement may be executed in several counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument. Signatures hereto may be facsimiles or electronically scanned copies which shall have the same full force and effect as a manually signed original thereof.

17.    Effects of Termination. Notwithstanding anything to the contrary contained herein, if this Agreement is terminated pursuant to Section 7 or Section 8 or expires by its terms, the provisions of Sections 4-6 and 10-20 of this Agreement shall survive and continue in full force and effect for the period stated in such Section or for one (1) year if no period is stated.

18.    Governing Law/Jurisdiction/Mediation. This Agreement shall be governed by the laws of the State of Delaware. The Company and the Employee consent to the exclusive in personam jurisdiction of the courts of the State of Delaware and the United States District Court for the District of Delaware in connection with any claim, dispute, or interpleader action arising under or in connection with this Agreement, or any other instrument or document delivered hereunder. If any action in connection with such a claim is commenced against the Company or the Employee in any court, the Company and the Employee also agree that service of process may be made on the Company and the Employee by certified or registered mail addressed to the Company and the Employee at their respective addresses specified above. All disputes arising between the parties to this Agreement, or their respective agents, employees, directors, officers, members, equity owners, heirs, executors, administrators, legal representatives, successors and assigns, shall be submitted to mandatory mediation prior to the commencement of any litigation in any court (other than for injunctive relief). Mediation shall be commenced by a party sending notice of a request for mediation to the other party with the nature of the dispute and the identity of one or more potential mediators. The other party shall respond within fourteen (14) days of the receipt of the mediation notice, acknowledging receipt of the mediation request and notice of acceptance of one of the identified potential mediators or delivery of a list of one or more other potential mediators. Mediation shall be confidential and nothing that occurs, is exchanged, or is otherwise discussed or said may be used in any subsequent legal proceeding; provided, however,

9

that any evidence previously disclosed or known by a party, or otherwise discoverable or admissible had the mediation not occurred, and not created solely for the purpose of the mediation, shall not be rendered confidential, inadmissible or non-discoverable solely as a result of its use in the mediation. Mediation shall be held in Plymouth Meeting, Pennsylvania. The mediator shall be selected jointly, may not have a conflict of interest that is not waived by all parties, and shall be paid fifty percent (50%) by the Company and fifty percent (50%) by the Employee unless otherwise agreed at the mediation. In the event the parties are unable to agree on a mediator, each party shall select one (1) mediator and the names shall be submitted to the Company's accountant in alphabetical order by the Employee (without any disclosure or indication by either party as to which party proposed the respective mediators), and the accountant shall select one of such mediators, which decision of the accountant shall be final. The parties agree that any statute of limitations or similar defense shall be tolled curing the period of the mandatory mediation process hereunder. Mediation shall be deemed terminated at any time that either the Company or the Employee gives the other party notice that the mediation is concluded or terminated.

19.   Entire Agreement: Contents of Agreement.

(a)   This Agreement supersedes any and all other agreements, either oral or written, between the parties with respect to the employment of Employee by the Company for the purposes set forth in Section 1 and contains all of the covenants and agreement between the parties with respect to such employment whatsoever. Each party to this agreement acknowledges that no representation, inducements, promises or agreements, orally or otherwise, have been made by any party, or anyone acting on behalf of any party, which are not embodied herein, and that no other agreement, statement, or promise not contained in this agreement shall be valid or binding. Any modification of this agreement will be effective only if it is in writing and signed by both parties to this agreement.

(b)   Employee acknowledges that from time to time, the Company may establish, maintain and distribute employee manuals or handbooks or personnel policy manuals, and officers or other representatives of the Company may make written or oral statements relating to personnel policies and procedures. Such manuals, handbooks and statements are intended only for general guidance. No policies, procedures or statements of any nature by or on behalf of the Company (whether written or oral and whether or not contained in any employee manual or handbook or personnel policy manual), and no acts or practices of any nature, shall be construed to modify this Agreement or to create express or implied obligations of any nature to Employee.

(c)   Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context indicates is appropriate.

20.   Remedies Cumulative: No Waiver: No remedy conferred upon the Company or the Employee by this Agreement is intended to be exclusive of any other remedy, and each and every such remedy shall be cumulative and shall be in addition to any remedy given hereunder or now or hereafter existing at law or in equity. No delay or omission by the Company or the Employee in exercising any right, remedy or power hereunder or existing at law or in equity shall be construed as a waiver thereof, and any such right, remedy or power may be exercised by the Company or the

Employee from time to time and as often as may be deemed expedient or necessary by the Company or the Employee at its or his sole discretion.

21.   Section 409A.

(a)   This Agreement shall at all times be administered and the provisions of this Agreement shall be interpreted consistent with the requirements of Section 409A. In the event that any provision of this Agreement does not comply with the requirements of Section 409A, the Company, in exercise of its sole discretion and without consent of Employee, may amend or modify this Agreement in any manner to the extent necessary to meet the requirements of Section 409A.

(b)   This Agreement is intended to comply with Section 409A or an exemption thereunder, and will be construed and administered in accordance with Section 409A. Notwithstanding any other provision of this Agreement, payments provided under this Agreement may only be made upon an event and in a manner that complies with Section 409A or an applicable exemption. Any payments under this Agreement that may be excluded from Section 409A either as separation pay due to an involuntary separation from service or as a short-term deferral will be excluded from Section 409A to the maximum extent possible. For purposes of Section 409A, each installment payment provided under this Agreement will be treated as a separate payment. Any payments to be made under this Agreement upon a termination of employment will only be made if such termination of employment constitutes a "separation from service" under Section 409A.

(c)   Notwithstanding any other provision of this Agreement, if at the time of Employee's termination of employment, Employee is a "specified employee," determined in accordance with Section 409A, any payments and benefits provided under this Agreement that constitute "nonqualified deferred compensation" subject to Section 409A that are provided to Employee on account of Employee's separation from service will not be paid until the first payroll date to occur following the six-month anniversary of Employee's termination date ("Specified Employee Payment Date"). The aggregate amount of any payments that would otherwise have been made during such six-month period will be paid in a lump sum on the Specified Employee Payment Date without interest and, thereafter, any remaining payments will be paid without delay in accordance with their original schedule. If Employee dies during the six-month period, any delayed payments will be paid to Employee's estate in a lump sum within thirty (30) calendar days after Employee's death.

(d)   Except as otherwise expressly provided herein, to the extent any expense reimbursement or the provision of any in-kind benefit under this Agreement or any document contemplated herein is determined to be subject to Section 409A, the amount of any such expenses eligible for reimbursement, or the provision of any in-kind benefit, in one calendar year shall not affect the expenses eligible for reimbursement in any other taxable year (except for any lifetime or other aggregate limitation applicable to medical expenses), in no event shall any expenses be reimbursed after the last day of the calendar year following the calendar year in which the Employee incurred such expenses, and in no event shall any right to reimbursement or the provision of any in-kind benefit be subject to liquidation or exchange for another benefit.

**[Signature Page Follows]**

11

**IN WITNESS WHEREOF**, the parties have executed this Employment Agreement as of the date first written above.

**EMPLOYEE:** _____

Michael Fried

**COMPANY:**                                  **ADAPTHEALTH LLC**

By: _____

Name: Stephen Griggs
Title:   Chief Executive Officer

*Signature Page to Employment Agreement (Michael Fried)*

**IN WITNESS WHEREOF**, the parties have executed this Employment Agreement as of the date first written above.

**EMPLOYEE:**

_____

Michael Fried

**COMPANY:**

**ADAPTHEALTH LLC**

By: _____

Name: Stephen Griggs

Title:   Chief Executive Officer

*Signature Page to Employment Agreement (Michael Fried)*

# Exhibit B

## Severance Agreement and General Release

This Severance Agreement and General Release ("**Agreement**") is made and entered into on the date last below written by and between AdaptHealth LLC ("**Company**") and Michael Fried ("**Employee**"). Company and Employee are sometimes collectively referred to herein individually as a "**Party**" and collectively as the "**Parties**."

WHEREAS, Company and Employee are parties to that certain Securities Purchase Agreement dated November 4, 2021 (the "**Purchase Agreement**"); and

WHEREAS, pursuant to the Purchase Agreement, Company and Employee entered into an Employment Agreement dated December 30, 2021 (the "**Employment Agreement**"), whereby Company engaged Employee to serve as President of Community Surgical Supply of Toms River, LLC ("**CSS**"); and

WHEREAS, Company and Employee desire to sever the relationship between them in a manner mutually beneficial to both parties; and

NOW THEREFORE, for and in consideration of the premises and of the mutual covenants and promises set forth herein, the adequacy of which is acknowledged by each of the parties, it is hereby agreed as follows:

1.     **Termination of Employment.** Employee's employment with Company shall terminate effective as of October 1, 2022 ("**Termination Date**").

2.     **Consideration of Agreement.** Employee shall have a period of 21 days after the date on which this Agreement is delivered to Employee to consider whether or not to execute this Agreement, unless this period is waived pursuant to provision 16(c) of this Agreement.

3.     **Effective Date.** This Agreement shall be effective as of the eighth day following the date on which it is executed by Employee ("**Effective Date**") unless Employee's written revocation is received by Employer prior to the eighth day.

4.     **Benefits Continuation.** Employee agrees and acknowledges that, to the extent Employee was enrolled in any of Company's benefits plans that are covered by the Consolidated Omnibus Budget Reconciliation Act of 1985 ("**COBRA**"), Employee incurred a COBRA event on the Termination Date and Employee's health insurance coverage will terminate in accordance with the terms of the plan. Employee will be notified in writing of the benefits that may be continued under COBRA and of the terms, conditions, and limitations of such continuance. If Employee elects COBRA coverage, Company will pay the employer portion of health care premiums as if Employee remained employed during the first twelve (12) months of COBRA coverage, after which time the entire amount of the COBRA premiums shall be Employee's sole cost and expense. If, during the time of employer sponsored COBRA coverage Employee becomes eligible for coverage through new employment, Employee agrees to make timely notification to Company at which time Company sponsored COBRA coverage will end.

5.     **Employee Cooperation.** As a condition of receipt of the Severance Package set forth in Section 7, Employee agrees to cooperate with Company in all matters relating to the

winding up of Employee's pending work and the orderly transfer of any such pending work to other employees of Company through December 31, 2022 (or such later date as may be mutually agreed upon, in writing, by Company and Employee). Such cooperation shall entail Employee responding, within a reasonable period of time, to emails and telephone calls from Company personnel and participating in telephonic, "Zoom" and in person meetings of short duration in connection with Employee's transition of his previous employment responsibilities. Employee further agrees to cooperate fully with Company and its legal counsel in connection with any action, proceeding, or dispute arising out of matters in which Employee was directly or indirectly involved while serving as an employee of Company. This cooperation shall include, but not be limited to, meeting with, and providing information to, Company and its legal counsel, maintaining the confidentiality of any past or future privileged communications with Company's legal counsel, and being available to testify truthfully by affidavit, declaration, in depositions, or in any other forum on behalf of Company. Company agrees to reimburse Employee for Employee's reasonable and necessary out-of-pocket expenses associated with such cooperation, including, without limitation, Employee's reasonable attorneys' fees and expenses if such expenses are approved by the Company in advance upon written request.

6.      **Employee Introduction to Business Opportunities.** If Company requests that Employee introduce Company to business opportunities after the Termination Date, Company and Employee will negotiate, in good faith, regarding such arrangement and if Company and Employee reach agreement on the terms of such arrangement, such terms will be memorialized in a written agreement mutually satisfactory to Company and Employee.

7.      **Severance Package.** In consideration of the release and other promises provided by Employee in this Agreement, Company agrees to provide Employee the following "**Severance Package**":

a.      Company will pay Employee the equivalent sum of 12 months' of Employee's Base Salary in effect on the Termination Date for a total gross amount of $350,000.00 ("**Severance Pay**"). The Severance Pay shall be paid on a bi-weekly basis, consistent with the Company's payroll practices and shall commence on the first regular payroll date after the Effective Date. The Severance Pay will be less such amounts as are required to be withheld or deducted by law.

b.      In lieu of and in consideration of any obligation of the Company to pay Employee any bonus, Company will pay Employee the total gross amount of $175,000.00 (the "**2022 Bonus Payment**"). The 2022 Bonus Payment shall be paid out at the same time bonus amounts are paid to similarly situated executives of the Company during the first quarter of calendar year 2023. The 2022 Bonus Payment will be less such amounts as are required to be withheld or deducted by law. Employee agrees and acknowledges that, but for this Agreement, Employee would not otherwise be entitled to receive the 2022 Bonus Payment.

c.      Company acknowledges that CSS has achieved the net revenue threshold set forth in Section 3(e)(ii) of the Employment Agreement for calendar year 2022 and expects to achieve the annual net revenue threshold set forth in Section 3(e)(i) of the Employment Agreement for calendar year 2022. Subject to the actual performance of CSS

with respect to the measures set forth in Sections 3(e)(i) and (ii), Company will pay Employee the Incentive Compensation (as defined in and determined pursuant to the Employment Agreement) that Employee would have been eligible to receive had Employee remained employed by Company through December 31, 2022 (the "**Incentive Pay**"), in one lump sum payment on or before February 28, 2023. The Incentive Pay will be less such amounts as are required to be withheld or deducted by law. Employee agrees and acknowledges that, but for this Agreement, Employee would not otherwise be entitled to receive any Incentive Pay.

     d.    <u>Reserved</u>.

     e.    Company will pay Employee the total gross amount of $500,000, if on or before December 31, 2023 the following conditions are satisfied: (i) Northwell Health contributes substantially all of its assets relating to its home infusion operation to a newly formed entity; (ii) at least 50% of the issued and outstanding equity interests of such entity are directly or indirectly owned by Company; and (iii) the board of directors or similar governing body is controlled by employees of Company or its Affiliates. If the conditions described in the immediately preceding sentence are not satisfied but Northwell Health and Company (or its Affiliates) enter into a commercial relationship relating to the provision of home infusion services on or before December 31, 2023, then Company shall negotiate in good faith with Employee regarding the amount of compensation to be paid to Employee; such amount shall be reasonable and consistent with the scale of the opportunity pursued by the Company and the Parties' understanding shall be memorialized in an agreement mutually satisfactory to Company and Employee. For the avoidance of doubt, in no event shall Company be obligated to make payments to Employee pursuant to this Section 7(e) in excess of $500,000. Company will pay Employee the amount described herein, within 30 days following, as applicable, the commencement of the joint venture described in the first sentence of this Section 7(e) or in accordance with the provisions of the agreement to be entered into among Company and Employee as contemplated in the second sentence of this Section 7(e).

Employee agrees that Employee is not otherwise entitled to the Severance Package. Except as otherwise provided herein, Employee has not and shall not accrue any benefits, paid time off, vacation pay, holiday pay, personal days, etc. after the Termination Date, and no other amounts are due Employee by Company.

     8.    **Non-Admission of Liability.** Company and Employee agree that nothing contained in this Agreement is an admission or evidence of any wrongdoing by any party. This Agreement may not be introduced into evidence except in a proceeding to enforce it.

     9.    **Non-Disparagement.** Employee agrees that Employee will not at any time after the date hereof disparage, criticize or make any negative comments regarding Company, or take or omit to take any action the effect of which is to criticize or otherwise disparage Company in any way. Employee further agrees that Employee will not interfere in any manner with the business of Company, or its management, members, officers, or employees. Company agrees that its executive officers will not at any time after the date hereof disparage, criticize or make any negative comments regarding Employee.

10.    **Non-Solicitation.** Except as otherwise agreed to in writing by the Chief Executive Officer or President of the Company, Employee hereby agrees that, for a period from the Termination Date through March 31, 2024 (the "**Restricted Period**") and except as agreed to in writing by the Company, the Employee will not (on behalf of the Employee or any other person or entity), directly or indirectly, or by assisting others hire or solicit or attempt to hire or solicit, any person who was an employee or independent contractor of the Company on the Employee's Termination Date (the "**Restricted Individuals**"), it being understood that this Section 10 shall not restrict the Employee or the Employee's affiliates from hiring any Restricted Individuals after the longer of (i) six (6) months from the date of termination of such Restricted Individual's employment or engagement by the Company or its Affiliates and (ii) six (6) months from the date such Restricted Individual ceases to provide any paid work or services to the Company or its Affiliates. Employee understands and agrees that this non-solicitation provision prohibits Employee from discussing any business matters related to the Company with any Restricted Individuals and that any interactions with such Restricted Individuals during the Restricted Period shall be limited to social interactions unless otherwise requested by the Company. The Parties agree that this provision does not relate to Employee's solicitation or hiring of Employee's wife or children provided that Employee is not otherwise in violation of any restrictive covenants between Employee and the Company.

11.    **Non-Competition.** Except as otherwise agreed to in writing by the Chief Executive Officer or President of the Company, Employee hereby agrees that, during the Restricted Period, Employee will not, directly or by assisting others, within fifty (50) miles of any location where the Company conducts business (a) contact, solicit or attempt to solicit any person or entity who is an existing or prospective customer or supplier of the Company as of Employee's Termination Date, for purposes of providing products or services that are competitive with the products or services offered by the Company on the Employee's Termination Date, (b) provide to any existing or prospective customer or supplier any products or services that are competitive with the products or services offered by the Company on the Employee's Termination Date, or (c) otherwise interfere with the relationship between any such existing or prospective customer or supplier and the Company or its Affiliates.

12.    **References and Reinstatement.** Employee agrees that Employee does not wish, does not seek, and does waive any claim for reinstatement with Company and its successors and hereby agrees not to re-apply to Company for employment at any time after this Agreement has been fully executed. Upon the request of any future or prospective employer of Employee for an employment reference, Company agrees to provide a neutral employment reference, by verifying for any such employer Employee's title and dates of employment.

13.    **Employee General Release.** Employee, in consideration of the Severance Package and other valuable consideration outlined herein, and with the intent of binding Employee, Employee's heirs, personal representatives, administrators, successors, and assigns, hereby releases, acquits and forever discharges Company and its affiliates and subsidiaries, together with their respective directors, members, owners, officers, agents, and employees, ("**Released Parties**"), from and against any and all claims, charges, causes of action or liabilities that Employee has or may have against the Released Parties related to or arising out of Employee's employment with the Company as of the date Employee executes this Agreement ("**Execution Date**"), whether known or unknown, including, but not limited to, claims for: employment

discrimination, harassment, or retaliation of any kind under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act (including the Older Workers Benefit Protection Act), the Americans with Disabilities Act, the Employee Retirement Income Security Act of 1974, the Family and Medical Leave Act, the Occupational Safety and Health Act; the New Jersey Law Against Discrimination; the New Jersey Civil Rights Act; the New Jersey Civil Union Act; the New Jersey Domestic Partnership Act; and the New Jersey Smoking Law; the New Jersey Family Leave Act; the New Jersey Equal Pay Act; the New Jersey Wage and Hour Law; the New Jersey Conscientious Employee Protection Act; retaliation for exercise of rights under the New Jersey Workers' Compensation Act; fraud; breach of express or implied contract; defamation; negligence; misrepresentation of any kind; intentional infliction of emotional distress; negligent infliction of emotional distress; and all other claims Employee has or may have against the Released Parties as of the Execution Date arising under any federal, state, or local law or regulation. Employee hereby expressly waives the benefit of any statute or rule of law, which, if applied to this Agreement, would otherwise exclude from its binding effect any claims not now known by Employee to exist. Employee further acknowledges, understands and agrees that any claims Employee may have against the Released Parties are dropped for all purposes and all times. Company and Employee agree that, to the extent Employee may have a right to file or participate in a claim or charge against Company that is not releasable, this Agreement shall not be intended to release, waive or otherwise extend to such a right, if any. Employee and Company acknowledge that the above release of claims shall not apply to claims Employee may have against the Company arising out of or related to the Purchase Agreement.

14.     **Vested Benefits.** Employee acknowledges that the above release of claims shall not apply to (a) the obligation of Company to provide the Severance Package, and (b) Employee's vested benefits, if any, under any of Employee's benefit plans. Employee's rights under such benefit plans shall be governed by the terms of the respective plan.

15.     **Employee Covenant Not to Sue.** Employee further understands that by signing this Agreement, Employee is agreeing to not file any claims or lawsuits against the Released Parties with any court. If Employee is requested to participate in any lawsuit, other proceeding, or investigation against any of the Released Parties, Employee agrees to immediately notify Company's General Counsel, or his/her successor. The parties agree that to the extent, if any, Employee may have any non-waivable rights to file or participate in a claim or charge against any of the Released Parties, this Agreement shall not be intended to waive such a right. However, even if Employee has a right to file or participate in a claim or charge against any of the Released Parties, Employee agrees that Employee shall not obtain, and hereby waives Employee's right to, any relief of any kind from such a claim or charge. Notwithstanding anything contained herein to the contrary, Employee and Company acknowledge and agree that the aforesaid covenant not to sue and the other restrictions set forth in this Section 15 shall not apply to claims, rights and remedies that Employee may have against the Company arising out of or related to the Purchase Agreement.

16.     **Employee Age Claim Waiver.** Employee understands that there is included within the release given by Employee in the section of this Agreement entitled "Employee General Release" a release and waiver of all rights and claims Employee may have under the Age Discrimination in Employment Act, 29 U.S.C. §621 et seq. (the "**ADEA**"). In compliance with the ADEA, Company hereby advises Employee as follows:

a.      Employee has the right, and is encouraged, to consult with an attorney at Employee's own cost prior to executing this Agreement.

b.      The waiver and release of rights and claims under the ADEA pertains only to rights and claims arising on or before the Execution Date of this Agreement, but not to rights and claims under the ADEA that arise after the Execution Date of this Agreement.

c.      Employee shall have a period of 21 days after the date on which this Agreement is delivered to Employee to consider whether or not to execute it. Employee may accept the offer contained in the Agreement at any time within the 21-day period by signing it and delivering it to Company. If Employee does so, the 21-day period automatically ceases. If Employee does not accept the offer prior to the end of the 21-day period, it shall be automatically revoked. Employee agrees that changes to this Agreement, whether material or immaterial, will not restart this 21-day consideration period.

d.      Notwithstanding any other provisions hereof, this Agreement shall not become effective until seven days following the Execution Date ("**Revocation Period**"). During the Revocation Period, Employee may revoke this Agreement by notice in writing to Company, in which case this Agreement shall be null and void and unenforceable by either party and Employee shall not be entitled to receive the Severance Package from Company.

Employee represents and warrants that Employee freely and knowingly, and after due consideration and having the opportunity to consult with an attorney, enters into this Agreement intending to waive, settle, and release all claims Employee has or might have against Company as of the Execution Date. Nothing in this Agreement shall have the effect or be interpreted as having the effect of imposing any condition precedent, penalty or other limitation adversely affecting Employee's right to challenge the validity of the ADEA waiver and release.

17.     **Employee Acknowledgements.** Employee hereby represents and warrants that, as of the date of this Agreement, Employee is not aware of any violations of any applicable federal, state or local laws or regulations committed by Employee or by other employees of Company that occurred during Employee's employment, which commenced on December 30, 2021. Employee further represents and warrants that, as of the date of this Agreement, Employee is aware of no liabilities, obligations or claims (absolute, accrued, fixed or contingent, matured or unmatured, or otherwise), including liabilities, obligations or claims that may become known or which arise only after the date of this Agreement and that result from actions, omissions or occurrences of Employee, that Employee has not disclosed to Company. Further, Employee acknowledges and agrees that Employee was paid all compensation that was due through the Termination Date (except for the Earnout Pay) and that Employee has not been retaliated against for asserting rights or claims under local, state, or federal law.

18.     **Confidential Nature of Agreement.** Employee represents and agrees that Employee will keep the terms, amount and fact of this Agreement and any prior offers of or demands for settlement pay and all matters pertaining to Employee's termination of employment completely confidential, and will not disclose, divulge or publicize, directly or indirectly, to any third party the terms and conditions of this Agreement or any matters pertaining to Employee's

termination of employment except as may be necessary to establish or assert rights hereunder or as may be required by law or applicable regulation; provided, however, that Employee may, on a confidential basis, disclose this Agreement to Employee's spouse, financial advisors, and attorneys.

19.     **Confidential Information.** Employee will not, except as authorized by Company in writing or as required by any law, rule, or regulation or other binding prohibitions or restrictions after providing prior written notice to Company within sufficient time for Company to object to production or disclosure or quash subpoenas related to the same, directly or indirectly, use for Employee's benefit or for the benefit of others, or disclose, communicate, divulge, furnish to, or convey to any other person, firm, or company, any Trade Secrets or Confidential Information (as such terms are defined in the Employment Agreement entered into by and between Employee and Company; the "Employment Contract") obtained by Employee during the period of Employee's employment with Company.

20.     **Immunity from Liability for Confidential Disclosure of a Trade Secret to the Government or in a Court Filing.** Employee shall not be held criminally or civilly liable under any U.S. Federal or State trade secret law for the disclosure of a trade secret that is made (a) (i) in confidence to a U.S. Federal, State or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

21.     **Use of Trade Secret Information in Anti-Retaliation Lawsuit.** If Employee files a lawsuit against Company for retaliation by Company for reporting by Employee of a suspected violation of law, Employee may disclose the trade secret to his/her attorney and use the trade secret information in the court proceeding, if Employee (a) files any document containing the trade secret under seal; and (b) does not disclose the trade secret, except pursuant to court order. Nothing in this Agreement is intended to conflict with 18 U.S.C. §1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. §1833(b).

22.     **Return of Documents and Property.** All documents and property in any way related to Company, its employees and/or its Trade Secrets and Confidential Information (as such terms are defined in the Employment Agreement) shall be and remain the sole and exclusive property of Company. As a condition precedent to receiving the Severance Package, Employee shall within two (2) business days after the Execution Date, return to Company all such documents and property in Employee's possession and control. Employee swears and affirms that Employee has not retained for Employee's own purposes or provided to any third parties any such Company documents or property that Employee created or obtained during the course of Employee's employment with Company, whether as original or copies. Employee's strict compliance with this provision is a condition of Employee's receipt of the Severance Package.

23.     **Enforcement.** Employee agrees that any breach of Sections 10, 11, and 19 of this Agreement would cause substantial and irreparable harm, not readily ascertainable or compensable in terms of money, to the Company for which remedies at law would be inadequate and that, in addition to any other remedy to which the Company may be entitled hereunder, and notwithstanding the terms of Section 29 hereof, the Company shall be entitled to temporary,

preliminary and other injunctive relief in the event the Employee violates the provisions of Sections 10, 11, and 19 of this Agreement, as well as damages, including, without limitation consequential damages, and an equitable accounting of all earnings, profits and benefits arising from such violation, in each case without the need to post any security or bond. Nothing herein contained shall be construed as prohibiting the Company from pursuing, in addition, any other remedies available to the Company for such breach. A waiver by the Company of any breach of any provision hereof shall not operate or be construed as a waiver of a breach of any other provision of this Agreement or of any subsequent breach by the Employee.

Employee acknowledges that the restrictions contained in Sections 10, 11, and 19 hereof are reasonable, and that the Company would not have entered into this Agreement, in the absence of such restrictions, and that any violation of any provision of those Sections will result in irreparable injury to the Company.

EMPLOYEE FURTHER REPRESENTS AND ACKNOWLEDGES THAT (i) HE HAS BEEN ADVISED BY THE COMPANY TO CONSULT HIS OWN LEGAL COUNSEL IN RESPECT OF THIS AGREEMENT, (ii) HE HAS HAD FULL OPPORTUNITY, PRIOR TO EXECUTION OF THIS AGREEMENT, TO REVIEW THOROUGHLY THIS AGREEMENT WITH HIS COUNSEL, AND (iii) HE HAS READ AND FULLY UNDERSTANDS THE TERMS AND PROVISIONS OF THIS AGREEMENT.

Employee agrees that the Company shall be entitled to preliminary and permanent injunctive relief, without the necessity of providing actual damages, as well as an equitable accounting of all earnings, profits and other benefits arising from any violation of Sections 10, 11, and 19 hereof, which rights shall be cumulative and in addition to any other rights or remedies to which the Company may be entitled. In the event that any of the provisions of Sections 10, 11, and 19 hereof should ever be adjudicated to exceed the time, geographic, product or service, or other limitations permitted by applicable law in any jurisdiction, then such provisions shall be deemed reformed in such jurisdiction to the maximum time, geographic, product or service, or other limitations permitted by applicable law.

24.     **Entire Agreement, Amendments.** This Agreement constitutes the entire agreement between the parties and supersedes all prior understandings, whether oral or written between them, relating to the subject of Employee's termination from employment. Notwithstanding the foregoing, , nothing contained in this Agreement shall be deemed to impact the enforceability of post-employment obligations undertaken by Company and Employee including, but not limited to, the restrictive covenants contained in the Employment Agreement, the Purchase Agreement, and any other agreement entered into between Employee and any of the Released Parties. For the avoidance of doubt, under no circumstances does this Agreement supersede or replace, as between Employee and Company and its Affiliates, the terms and conditions set forth in Section 6.7 of the Purchase Agreement (Non-Competition; Non-Solicitation).  Any modification to this Agreement must be made in writing and signed by the parties. No amendment or modification of any provision of this Agreement will be effective unless set forth in a document that purports to amend this Agreement and is executed by all parties hereto.

25.     **Binding Effect; Third Party Beneficiaries.** This Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their respective heirs, legal

representatives, successors, and permitted assigns. Except as expressly set forth herein, this Agreement is not intended to confer any rights or remedies upon any other person or entity.

26.   **Acknowledgement.** Employee acknowledges that Employee has read this entire Agreement and fully understands its terms and conditions; that Employee was advised to obtain legal counsel and/or representation to review this Agreement and that Employee has had the opportunity to do so; that Employee may revoke this Agreement by written notice to Company within seven days after Employee's signature of acceptance hereon; that no other representations have been made to Employee other than those contained herein; and that Employee enters into this Agreement of Employee's own free will and choice with no undue influence, fraud, pressure, duress, or coercion by Company.

27.   **Assignment.** Neither party shall sell, transfer, assign, or subcontract any right or obligation hereunder except as expressly provided herein without the prior written consent of each other party. Any act in derogation of the foregoing shall be null and void.

28.   **Governing Law.** This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

29.   **Venue and Jurisdiction; Arbitration of Northwell Disputes.** The exclusive venue and jurisdiction for any litigation concerning this Agreement shall be in the State of Delaware and the U.S. District Court for the District of Delaware, which shall have personal jurisdiction over Employee and jurisdiction over matters arising out of this Agreement, and Employee hereby irrevocably waives any and all objections to personal jurisdiction, venue or convenience in the aforementioned court. Notwithstanding the foregoing, in the event of a dispute between the Parties to this Agreement, or their respective agents, employees, directors, officers, members, equity owners, heirs, executors, administrators, legal representatives, successors and assigns, relating to or arising out of Section 7(e) ("**Northwell Dispute**"), such dispute shall be submitted to final and binding arbitration in accordance with the rules and procedures of the Judicial Arbitration and Mediation Services, Inc. ("**JAMS**") applicable to the dispute. Comprehensive arbitration rules and procedures are available at https://www.jamsadr.com/rules-comprehensive-arbitration/. The arbitration shall be held in Plymouth Meeting, Pennsylvania. The arbitration will be conducted before an arbitrator who is a member of JAMS and mutually selected by the Parties from the JAMS Panel. In the event that the Parties are unable to mutually agree upon an arbitrator, selection of an arbitrator shall be governed by the applicable JAMS rules. The arbitrator shall have the authority to grant all monetary or equitable relief (including, without limitation, injunctive relief, ancillary costs and fees and punitive damages) available under state and federal law.  Either Party shall have the right to appeal any adverse rulings or judgments to the JAMS Panel of Retired Appellate Court Justices. The arbitrator may grant any remedy or relief to which the Parties would have otherwise been entitled had the matter been heard in a court of law and shall not grant any remedy or relief that could not have been granted had the matter been heard in a court of law.  The Parties agree that the arbitrator shall not have the power to commit errors of law or legal reasoning, and that the award may be vacated or corrected on appeal to a Pennsylvania state court of competent jurisdiction for any such error. Judgment on any award rendered by the arbitrator may be entered and enforced by any court having jurisdiction thereof.

To the extent permitted by law, the hearing and all filings and other proceedings shall be treated in a private and confidential manner by the arbitrator and all parties and representatives and shall not be disclosed except as necessary for any related judicial proceedings. The arbitrator's fees shall be paid fifty percent (50%) by the Company and fifty percent (50%) by the Employee. All other costs, expenses and attorneys' fees shall be borne by the party incurring them. Any postponement or cancellation fee imposed by the arbitration service will be paid by the party requesting the postponement or cancellation, unless the arbitrator determines otherwise. Any other fees charged or imposed by JAMS or the arbitrator shall be paid as directed by JAMS or the arbitrator in accordance with applicable law and this Agreement, as applicable, except that Employee will not be obligated to pay any fees that would not be applicable, or that could not be imposed, if the dispute was proceeding in a Pennsylvania court. Except as provided by the JAMS rules or this Agreement, arbitration shall be the sole, exclusive and final remedy for any Northwell Dispute between the Parties hereto or their respective agents, employees, directors, officers, members, equity owners, heirs, executors, administrators, legal representatives, successors and assigns. Accordingly, except as provided for by the JAMS rules or this Agreement, neither Party will be permitted to pursue court action regarding claims that are subject to arbitration and EACH PARTY IRREVOCABLY WAIVES ANY RIGHT TO ANY TRIAL IN A COURT THAT WOULD OTHERWISE HAVE JURISDICTION OVER ANY NORTHWELL DISPUTE.

30.     **Section 409(A).** This Agreement shall at all times be administered and the provisions of this Agreement shall be interpreted consistent with the requirements of Section 409(A) of the Internal Revenue Code. In the event that any provision of this Agreement does not comply with the requirements of Section 409(A), the Company, in exercise of its sole discretion and without consent of Employee, may amend or modify this Agreement in any manner to the extent necessary to meet the requirements of Section 409(A).

31.     **Waivers.** No waiver by any party hereto of any condition or provision of this Agreement to be performed by another party shall be valid unless in writing, and no such valid waiver shall be deemed a waiver of any similar or dissimilar provisions or conditions at the same or at any prior or subsequent time.

32.     **Notice.** All notices provided for in this Agreement shall be in writing and shall be given either delivered by (a) personal delivery of the notice to the party entitled thereto or (b) a reputable overnight delivery service or (c) depositing the same with the United States Postal Service, first class mail, postage prepaid, to the address of the party entitled thereto. The notice shall be deemed to have been received in case (a) on the date of its actual receipt by the party entitled thereto in cases (a) and (b) above or in case (c), two (2) days after the date of its deposit with the United States Postal Service.

33.     **Severability.** The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any one or more of the provisions hereof shall not affect the validity and enforceability of the other provisions hereof. In addition, if any section hereof is found to be partially enforceable, then it shall be enforced to that extent. A court with jurisdiction over the matters contained in this Agreement shall have the authority to revise the language hereof to the extent necessary to make any such section or covenant of this Agreement enforceable to the fullest extent permitted by law.

34.     **Costs and Expenses.** If either party shall commence a proceeding against the other to enforce and/or recover damages for breach of this Agreement, the prevailing party in such proceeding shall be entitled to recover from the other party all reasonable costs and expenses of enforcement and collection of any and all remedies and damages, or all reasonable costs and expenses of defense, as the case may be. The foregoing costs and expenses shall include reasonable attorneys' fees.

35.     **Headings.** The sections and other headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

36.     **Counterparts.** This Agreement may be executed in any number of counterparts, and each such counterpart shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement.

**[Signature Page Follows]**

**IN WITNESS WHEREOF,** Employee has executed this Agreement and Company has caused this Agreement to be executed by its duly authorized representatives.

**COMPANY:**

ADAPTHEALTH LLC

By: _Chris Joyce_
7C447050FDFD4E0...

Title: Vice President

Date: 10/18/2022

**EMPLOYEE:**

MICHAEL FRIED

Date: 10-14-2022

Settlement Agreement and General Release